**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DONALD KOVAC, | ) |
| | ) |
| Plaintiff, | ) Civil Action No.: 2:09-cv-400 |
| | ) |
| vs. | ) |
| | ) |
| PENNSYLVANIA TURNPIKE COMMISSION, MITCHELL RUBIN, GEORGE HATALOWICH, MELVIN SHELTON and MARK ROWE, | ) ) ) ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO COMMISSION
DEFENDANTS' AND MARK ROWE'S
MOTIONS FOR SUMMARY JUDGMENT**

## I. Introduction

This action stems from Defendants' retaliation against Plaintiff for exercising his freedom of speech and political association guaranteed under the First Amendment. In November, 2008, after three years of distinguished service for the Pennsylvania Turnpike Commission ("PTC"), Plaintiff was infamously pulled over on the side of the turnpike by a Pennsylvania State Trooper. Plaintiff had committed no crime; rather, Plaintiff was instructed to call PTC headquarters and was fired on the side of the road. Defendants would have the court believe that Plaintiff was fired simply for economic/performance reasons. Reading all factual inferences in favor of Plaintiff, however, indeed the record reveals that Plaintiff was fired for not only reporting the corruption of fellow turnpike employees, but also because Plaintiff refused to participate in the political culture that infests the PTC.

1

## II. Argument

### A. Plaintiff's First Amendment Retaliation Against Speech Claim Creates a Jury Question

To determine whether a public employee's speech is entitled to First Amendment protection, the Third Circuit applies a three-step test derived from the Supreme Court's decisions in *Connick v. Meyers*, 461 U.S. 138 (1983) and *Pickering v. Board of Education*, 391 U.S. 563 (1968). *McGreevy v. Stroup*, 412 F.3d 359, 364 (3d Cir. 2005). The first step is to determine whether the speech involves a matter of public concern. *Id*. If the speech involves a matter of public concern, then the court will determine under the *Pickering* balancing test "whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workforce efficiency and avoiding workforce disruption." *Id*. "Finally, if these criteria are met, plaintiff must show that protected activity was a substantial or motivating factor in the alleged retaliatory action. *Id*. "Whereas the first and second step inquires are questions of law for the court, the final inquiry presents a question of fact for the jury. *Id*.

### 1. Plaintiff's Comments to Joseph Brimmeier Concerning the Corruption of Defendant Melvin Shelton, Defendant Rowe and Congress-man Brady are Protected Under the First Amendment

The Supreme Court has long held that constitutional freedom of speech is not lost to a public employee merely because he arranges to communicate privately with his employer rather than spread his views before the public. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415-416 (1979). In *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Supreme Court narrowed the

2

scope of protected speech and held that public employees are not entitled to First Amendment protections when their speech is made pursuant to their official duties. Thus, in *Garcetti*, when a supervising district attorney wrote a memorandum to his superiors regarding certain problems with a search warrant he was not afforded First Amendment protection. In its reasoning, the Court noted that "the parties do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties;" *i.e.* "Ceballos wrote his disposition memo because that is what he, as a calendar deputy, was employed to do." *Id.* 421. The Court further observed that it did not have an opportunity to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is serious debate. . . the proper inquiry is a practical one." *Id.* at 424-425.

In the present case, Plaintiff's speech with regards to Defendant Shelton's improprieties using a PTC vehicle, fuel, and EZ Pass to chauffer Congressman Brady was not made pursuant to his official duties, and thus protected speech. (SMF ¶ 79). Likewise, Plaintiff's statements to Brimmeier regarding Defendants Shelton and Rowe's improprieties of selling tickets for Philadelphia Democratic fundraising events was also protected speech under the First Amendment. *Id.* Unlike the assistant attorney in *Garcetti* who, both sides there agreed, wrote the memorandum pursuant his official duties, there is no similar agreement here. Furthermore, a hearing officer who presided over union grievances, as a practical matter, would not have an official duty to report a co-worker's corruption.

3

Defendants' reliance on *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007) is misplaced for several reasons. In that case, the court affirmed a judgment granted as a matter of law when it held that plaintiffs', former state troopers, complaints to their supervisors and subsequent statements to the State Auditor about safety at a state trooper firing range were not protected under the First Amendment because they where spoken pursuant to their official duties. *Id*. at 248. The *Foraker* Court reasoned that the plaintiffs "were expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command" *Id*. at 243. The *Foraker* Court further observed that plaintiffs were compelled by executive order of the Governor's office to report the same to the state auditor. *Id*. Thus, the court focused on the practical question of whether the speech was "made pursuant to employment duties" and was "among the tasks [Plaintiffs were] paid to perform. *Id*. To be sure, the *Foraker* Court reached its conclusion after plaintiffs' "claims were presented in detail at a jury trial, giving both the District Court and [it] comprehensive information from which to answer the question of whether [plaintiffs] spoke pursuant to their official duties." *Id*. at 240.

By contrast, in this case there are yet material questions of fact whether Plaintiff was required, "pursuant to [his] official duties," to report Shelton's, Congressman Brady's, and Rowe's corruption to Brimmeier. This is particularly true given the fact that Brimmeier and Hatalowich offered conflicting testimony regarding whether Plaintiff even supervised Shelton. (SMF ¶ 82). Moreover, unlike in *Foraker*, where the State Auditor specifically directed plaintiffs to report

4

safety issues, here, Defendants cannot point an official directive, or evidence of any job description for the speech in question. Furthermore, as a "practical matter" it simply was not a function Plaintiff was "paid to perform."

Instead, this case is more akin to *Givhan, supra.* In that case, the Supreme Court recognized First Amendment Protection for an employee who raised concerns over a school's racist employment practices to its principal. *Givhan*, 439 U.S. at 413-416. The Supreme Court "realized that a public employee can wear a citizen's hat when speaking on subjects closely tied to the employee's own job. . . *Givhan* stands for the same conclusion even when the speech is not addressed to the pubic at large." *Garcetti*, 547 U.S. at 430 (STEVENS, J., dissenting).

Defendants contend that Plaintiff admitted that it was pursuant his *official duties* to report Defendant Shelton's and Rowe's misconduct. Plaintiff testified that "[he felt] that anything that had an adverse effect on the Turnpike Commission, if [he] thought it was important enough, [he] would talk to Brimmeier." While Commission Defendants would like to interpret this testimony as an admission as a *matter of law*, a jury could reasonably interpret Plaintiff's testimony to mean that Plaintiff would simply report corruption of fellow employees because it was the morally correct thing to do. In any event, because at the summary judgment stage the facts must be considered in a light most favorable to the non-moving party, the court should not accept Defendants' interpretation of Plaintiff's testimony. See, *e.g.*, *McGreevy,* 413 F.3d at 363.

### 2. Plaintiff Spoke Out On Matters of Public Concern

It is axiomatic that allegations of corrupt practices by government officials are of the utmost public concern. *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir. 1989); *see also McGreevy*, 413 F.3d at 355 (speech involving government impropriety occupies the highest rung of First Amendment protection.) In *O'Donnell*, the Third Circuit held that the First Amendment protected a former police officer when he "sought to bring to light actual or potential wrongdoing or breach of public trust on the part of the township supervisors." *Id*. Moreover, the Third Circuit has consistently held that public employees' criticism of office internal operations is a matter of public concern. *See Zamboni v. Stamler*, 847 F.2d 73, 77 (3d Cir. 1988) (civil service employee criticism of county prosecutor's reorganization and promotion plan); *Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988) (holding that a civilian employee of the Pennsylvania State Police who spoke to a reporter concerning her personnel problems and allegations that she was being harassed because of racial animus "was speaking on a matter of public concern."); *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir. 1983) (county auto mechanic's criticism at public county board meeting of the internal management of the Department of Motor Vehicles); *Trotman v. Board of Trustees of Lincoln University,* 635 F.2d 216 (3d Cir. 1980) (professors' criticism of university president's efforts to increase faculty/student ratio); *Monsanto v. Quinn,* 674 F.2d 990 (3d Cir. 1982) (tax department employee's letters to tax commissioner expressing dissatisfaction with operation and management of the Tax Division).

In the present case, Plaintiff has alleged and testified that he went to Brimmeier and explained the corrupt practices of Defendant Shelton who did little turnpike work, but rather worked to further the interests of Congressman Brady, the Philadelphia Democratic Committee and the Local 77. (SMF ¶ 79). Plaintiff also spoke out to Brimmeier regarding Defendants Shelton and Rowe's improper sale of political fundraising tickets for Democratic fundraising events. *Id.* As was held in *O'Donnell*, the matters Plaintiff conveyed to Brimmeier, *i.e.*, breach of public trust and various legal improprieties, are of the "utmost concern." *O'Donnell*, 875 F.2d at 1061.

Finally, with regards to The *Pickering* balancing test, Defendants bear a "truly heavy burden to present evidence that Plaintiff's" speech greatly disrupted the TPC. *McGreevy*, 413 F.3d at 355. Conspicuously absent from Defendants' briefs, however, is any argument about disruption as a result of Plaintiff's speech. Therefore, particularly at the summary judgment stage, Plaintiff's speech is deemed protected. *Id.*

### 3.  Substantial or Motivating Factor

Finally, whether Plaintiff's constitutionally protected conduct was a motivating factor for his termination is a jury question. *Merkle v. Upper Dublin School Dist.,* 211 F.3d 782 (3d Cir. 2000); *see also Watters v. City of Philadelphia*, 55 F.3d 886, 891 n. 3 (3d Cir.1995); *Zamboni v. Stamler,* 847 F.2d 73, 79 n. 6, 80 (3d Cir. 1988) ("these inquiries [whether a substantial or motivating factor and whether same actions would have been taken regardless] ... are for the jury"). In *Merkle*, The Third Circuit noted that: "Where a

reasonable inference can be drawn that an employee's speech was **at least one factor** considered by an employer in deciding whether to take action against the employee, the question of whether the speech was a motivating factor in that determination is best left to the jury." 211 F.3d at 795 (emphasis added).

Commission Defendants would have this court believe that the Turnpike was the epitome of fiscal austerity with its budget cuts, and that, is why Plaintiff was laid off. The record, however, tells a different story. First, when Plaintiff was terminated in November, 2008 a budget for the year that was then underway was not even in place. (SMF ¶ 92). In fact, once the budget was finally and belatedly passed, *it contained no reduction at all*; rather the budget remained flat. (SMF ¶ 93). Second, Defendant Hatalowich testified that the Turnpike actually *added* new management positions during the fiscal year in which Plaintiff was terminated. (SMF ¶ 94). Finally, although both Defendant Hatalowich and Brimmeier testified that there were no pay raises, both admitted that the Turnpike implemented "equity adjustments" – Turnpike Commission jargon for pay raises. *Id*.

Plaintiff has produced more than sufficient evidence supporting his productivity. The record reflects that Plaintiff had succeeded in getting Local 77 to sign a collective bargaining agreement in 2005, something the Turnpike Commission had been unable to accomplish without him; Plaintiff saved hundreds of thousands of dollars in unemployment compensation costs by having fare collection employees closely monitored by Plaintiff's unit; Plaintiff eliminated one full-time secretarial position after it became vacant; He decided

8

grievances in an objective and fair manner; Plaintiff reduced the number of steps in the grievance procedure from four to three, making it more timely and efficient; and Plaintiff effectively acted as a liaison between problem employees and their department heads.  (SMF ¶ 80).

The Commission Defendants argue that Plaintiff was an unproductive worker, yet offer trivial evidence to support their argument.  For example, the Commission Defendants find it revealing that Plaintiff would occasionally do crossword puzzles.  This disingenuous attempt to characterize Plaintiff as a lazy and therefore disposable worker, however, presupposes that there was an infinite amount of work for Plaintiff to do.  It further assumes that since there were times when Plaintiff was not busy, his job was not necessary.  This, of course, is not true for an individual like Plaintiff – or like a firefighter, for example – whose job consists primarily in responding to events whose occurrence and timing are outside of his control.  Plaintiff's testimony indicates that, as a hearing officer, the number of grievances he would preside over simply fluctuated in an essentially random fashion.  (SMF ¶ 91).

Furthermore, there is a significant question of credibility with regards to the Commission Defendants' opinions regarding Plaintiff's performance that cannot be resolved at summary judgment.  While Ms. Schlegel, for instance, claims that Plaintiff's work was sub-par, Plaintiff testified that Schlegel's own position was a "façade" and "perfunctory." (SMF ¶ 69).  Gary Pedicone, a Turnpike union official from Western Pennsylvania who is not a party to this action testified that Brimmeier, Hatalowich and Schlegel were totally and

completely incompetent. (SMF ¶ 98). With regards to Plaintiff's ability, however, he testified that he "thought [Plaintiff] did a good job." (SMF ¶ 99). In any event, conflicting testimony at this stage must be considered in the light most favorable to plaintiff and, thus, left for the trier of fact to make credibility determinations. *McGreevy*, F.3d at 363.

Finally, the pretext of Commission Defendants' "budgetary" reason for terminating Plaintiff is destroyed when the court considers *how* Plaintiff was notified of his termination: a Pennsylvania State Trooper pulled Plaintiff over on the side of the turnpike to instruct him to call the TPC's main office to be terminated. (SMF ¶ 29). This undignified conclusion to Plaintiff's distinguished service at the TPC transpired despite Defendant Hatalowich's testimony that Plaintiff was always going to be allowed to take his TPC vehicle home after he was terminated. (SMF ¶ 95).

Defendants' retaliatory animus continued. Despite appropriately deducting unemployment taxes from Plaintiff's earnings as a non-policymaker, the TPC further retaliated against Plaintiff by requiring that he retain counsel to defend his application for unemployment benefits against the TPC's remarkable argument that it never should have withheld unemployment money from his pay, and that it had merely kept that money for itself instead of remitting it into the unemployment compensation insurance system! (SMF ¶ 81).

Based on the foregoing, Plaintiff produced more than sufficient evidence for a *prima facie* First Amendment retaliation against speech claim.

**B.    Plaintiff's Political Affiliation Retaliation Claim Creates a Jury Question.**

The Supreme Court has long held that a plaintiff is entitled to First Amendment protections based on political affiliation except in very limited circumstances. *Branti v. Finkel*, 445 U.S 507 (1980).  The Supreme Court explained that "[t]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Goodman v. Pennsylvania Turnpike Commission*, 293 F. 3d 655, 663 (3d Cir. 2002) citing *Branti*, 445 U.S. at 518.  To be sure, "identical party affiliation does not necessarily ensure the subordinate's loyal adherence to the superior's policies." *Curinga v. City of Clariton*, 357 F.3d 305, 311 (3d Cir. 2004).

There are three elements to a *prima facie* political patronage claim. Plaintiff must show that:  (1) political affiliation was not a job requirement of the job; (2) he was engaged in constitutionally protected conduct; and (3) this conduct was a substantial or motivating factor in the government employment decision to terminate the employee. *Galli v. New Jersey Meadowlands*, 490 F.3d 264, 271 (3d Cir. 2007).  Ironically, one case cited by Commission Defendants, *Galli,* is on fours with Plaintiff's political patronage claim.

In *Galli*, an "apolitical" state government employee brought a First Amendment retaliation claim against the New Jersey Meadowlands Commission claiming that she was fired because she did not support the administration or political party in power.  In vacating the district court's summary judgment order

11

in favor of the defendants, the Third Circuit held, in part, that failure of plaintiff to support a campaign or political party because of general apathy, or disdain for politics was protected under the First Amendment. *Id. at 276.*

### 1. Political Patronage was Not a Job Requirement

Plaintiff has shown that political patronage was not a job requirement for several reasons. First, there is considerable evidence that Plaintiff did not have a "policy making position". (SMF ¶ 81). In fact, after a full evidentiary hearing an unemployment compensation referee concluded (and was subsequently affirmed on appeal by the Unemployment Compensation Board) that Plaintiff "did not make policy for the TPC, but was governed by the Collective Bargaining Agreement between commission and the unions, and by the policies of the Commission." *Id.* The referee additionally found "the fact that the claimant had the unemployment tax deducted [from his earnings] significant" in finding that Plaintiff was not a policy maker. Plaintiff testified several times that, in fact, he was not a policymaker. *Id.*

Plaintiff also testified that he was bound by the collective bargaining and, therefore, contrary to Commission Defendants' argument, he did *not* exercise total discretion. (SMF ¶ 58; Kovac dep., p. 23, 24). When evaluating a grievance, Plaintiff testified that he "looked at the discipline dolled out and determined whether that was sustainable under the [collective bargaining agreement]." *Id.* When asked whether "he ever, upon hearing a grievance, decided that the discipline wasn't sufficient and that more discipline should have been dolled out," Plaintiff answered: "It might have been a personal opinion, but

[he] didn't make contract law.  [He] simply upheld the grievance, that is all." *Id*. Thus, the decision-making and discretion of Plaintiff was actually quite limited as he was bound by the collective barraging agreement that was in place when evaluating grievances.

Moreover, nowhere does the record reflect that political affiliation with a particular party was a necessary criterion for Plaintiff's job.  The case of *Ness v. Marshall*, 660 F.2d 517 (3d Cir. 1981), cited by Defendants, is distinguishable.  In that case, the court found a city solicitor to be a policy making position, reasoning that "Section 2-35 of the [City of York's] Administrative Code specifies that the city solicitor (and any assistants deemed necessary by the mayor and city solicitor) shall be appointed by the mayor with advice and consent of the council and shall serve at the pleasure of the mayor." *Id*. at 521.  The *Ness* Court further observed that the Pennsylvania Supreme Court has recognized how important it is that public officials having the power to appoint municipal attorneys have trust and confidence in those attorneys. *Id*.

In the present case, unlike the solicitor in *Ness*, not only was Plaintiff not appointed pursuant to a statute, there is no evidence offered by Defendant Commissioners that his job had any bearing on any political party.  There is a good reason for the Commission Defendants' omission: as a hearing officer, Plaintiff's job was obviously to remain impartial.  Thus, in light of the Unemployment Compensation Board's finding that Plaintiff did not have a policy position and Plaintiff's testimony that his authority as a hearing officer was circumscribed by the collective bargaining agreement, he has more than

sustained his burden of putting forth evidence to overcome summary judgment on this element.

### 2. Plaintiff's Conduct Was Protected

Plaintiff's lack of deference and loyalty to Local 77, Congressman Brady, and the Philadelphia Democratic Committee is protected by the First Amendment. In *Galli v. New Jersey Meadowlands Commission*, 490 F.3d 265 (3d Cir. 2007), the court held that:

> a public employee, not in a policymaking position, may not be fired for failing to support the political party or candidate in power. ... Whether her failure to support is evidenced by a decision to support a competing candidate or party, or by a decision to be apolitical and support no candidate or party, it is constitutionally protected.

*Id.* at 274. Indeed, as the *Galli* Court noted, "[The Third Circuit has] suggested that the First Amendment protects an employee's failure to engage in any political conduct whatsoever. Id. at 273; *quoting Bennis v. Gable,* 823 F.2d 723, 727 n. 4 (3d Cir.1987).

Under clearly established law, Plaintiff's refusal to support the Philadelphia Democratic Committee or Local 77 was protected conduct under the First Amendment. Defendants' argument that Plaintiff has not claimed to have engaged in any functions protected by the First Amendment "such as attending political functions" is a straw man. The law under *Galli* clearly protects Plaintiff's decision *not* to support the Philadelphia Democratic Committee or purchase any tickets to its functions. The law further protects Plaintiff's conduct of *not* summarily granting, per Defendant Shelton's or Defendant Rowe's many

14

demands, all of Local 77's grievances. According to Plaintiff's testimony, he did not, of course, subsequently comply with Defendants' demands, but rather continued to evaluate grievances based on their merits. (SMF ¶ 76).

In sum, Plaintiff has offered sufficient evidence that he was completely disinterested in engaging in the politics of Philadelphia Democratic Local 11 Party that the record shows, pervaded the Turnpike. Under *Galli*, this disinterest was protected.

### 3. Whether Plaintiff's Protected Activity Was a Motivating Factor For His Termination is a Jury Question

Under *Galli*, Plaintiff must prove that Defendants had knowledge of his apathy towards Democratic politics and that his termination was a substantial or motivating factor, *i.e.*, causation of his termination. 490 F.3d at 275. There can be no question here that Defendants were well aware that Plaintiff was not affiliated with the Philadelphia Democratic Party or Local 77. Not only did Plaintiff refuse to submit to Defendant Shelton's demands to deny all of Local 250's grievances once it stopped buying political fundraising tickets, or grant Local 77 members preferential treatment per Shelton's or Rowe's demands, but Plaintiff himself refused to buy tickets and was not a member of the Philadelphia Democratic Committee. (SMF ¶76, ¶88 ). Thus, Plaintiff has met his burden at this stage with regards to the knowledge element.

The causation element for Plaintiff's political affiliation claim relies on the same facts and law as Plaintiff's freedom of expression retaliation claim. Plaintiff, therefore, incorporates section (A)(3) from this brief as though fully set forth herein at length, namely, that only a jury can answer this question.

C.   **Plaintiff Has Pleaded Sufficient Facts to Demonstrate That Defendants Violated Cleary Established Law When They Retaliated Against Plaintiff for Exercising His First Amendment Rights**

The Supreme Court instructs that when considering a defendant's motion based on qualified immunity, a reviewing court must, in a light most favorable to a plaintiff, determine whether there was a constitutional right violated and whether that right was clearly established. *Pearson v. Callahan*, 129 S.Ct. 808, 813 (2009). The Third Circuit has held that for a clearly established right to have been violated, there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put the defendants on notice that their conduct is constitutionally protected. *McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006).

In the present case, as demonstrated at length above, viewing the evidence in a light most favorable to the Plaintiff, this court may conclude that the record reflects enough evidence that Plaintiff was terminated in violation of the First Amendment's proscriptions against retaliatory discharge based on speech and political patronage. Thus, Plaintiff has met the Supreme Court's initial burden.

Moreover, the record additionally reflects that the Commission Defendants' actions violated clearly established law on both First Amendment counts. First, with regards to Plaintiff's retaliatory speech count, the Third Circuit case cited above, *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir. 1989), clearly established that a government worker cannot be terminated for speaking

out against political corruption. See also *Givhan*, 439 U.S. at 415-16 . Second, with regards to Plaintiff's political affiliation retaliation count, *Galli* clearly established that a state employee's failure to support a party, for whatever reason, is protected under the First Amendment. These dispositive cases stand for the proposition that the Commission Defendants' are not entitled to qualified immunity.

### III.   Conclusion

For the foregoing reasons, all of the motions for summary judgment in this action should be denied.

                    STRASSBURGER McKENNA GUTNICK
                          & GEFSKY


By: /s/ Jordan Lee Strassburger
    Ronald D. Barber, Esq.
    Pa. I.D. No. 52734
    Jordan Lee Strassburger, Esq.
    Pa. I.D. No. 209456

    Four Gateway Center, Suite 2200
    444 Liberty Avenue
    Pittsburgh, PA 15222
    (412) 281-5423
    (412) 281-8264 (Fax)

    Counsel for Plaintiff,
    Donald Kovac

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **Plaintiff's Brief in Opposition to Commission Defendants' and Mark Rowe's Motion for Summary Judgment** was serviced by CM/ECF, this 11th day of August, 2010, on the following:

Michael A. Farnan, Esquire
The Farnan Law Office
3710 Forbes Avenue, 3rd Floor
Pittsburgh, PA  15213
(Counsel for Defendants, Pennsylvania Turnpike Commission, Mitchell Rubin, George Hatalowich and Melvin Shelton)

Peter H. Demkovitz, Esquire
Markowitz & Richman
121 South Broad Street
Philadelphia, PA  19107
(Counsel for Defendant, Mark Rowe)

STRASSBURGER McKENNA GUTNICK
& GEFSKY

By: /s/ Jordan Lee Strassburger
Ronald D. Barber, Esq.
Pa. I.D. No. 52734
Jordan Lee Strassburger, Esq.
Pa. I.D. No. 209456

Counsel for Plaintiff,
Donald Kovac